UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JAMES LANHAM, BRADLEY FOLKOFF, JAKE HARNISH, ERIN OSWALD, and MOIRA LOGAN, on behalf of themselves and all others similarly situated,

Plaintiffs,

-against-

MLBAM ADVANCED MEDIA, L.P.,

Defendant.

25-cv-7780 (AS)

OPINION AND ORDER

ARUN SUBRAMANIAN, United States District Judge:

Five ticket purchasers—James Lanham, Bradley Folkoff, Jake Harnish, Erin Oswald, and Moira Logan—filed suit against MLB Advanced Media, L.P. ("MLBAM") after a 2025 cyberattack left many baseball (and concert) fans without tickets to their favorite events. Dkt. 12. Now at bat, MLBAM has moved to compel arbitration of plaintiffs' claims and, in the alternative, to dismiss the claims outright. Dkts. 18, 19. For the following reasons, MLBAM's motion to compel arbitration is DENIED, and its motion to dismiss is GRANTED IN PART and DENIED IN PART.

**BACKGROUND**

MLBAM operates a mobile application that acts as a digital wallet for fans' baseball and concert tickets. Dkt. 12 ¶¶ 1–2. It also functions as a medium to purchase tickets directly. *Id.* ¶ 38. By using the app, fans consent to MLBAM's collection of certain data, including their full name, street address, birth date, location data, usage data, and device data. *Id.* ¶ 40. MLBAM advertises the app as a way to "keep your tickets safe" and notes that purchasing tickets through it "is simple, secure, and guarantees 100% authentic tickets." *Id.* ¶¶ 3, 38. But in late 2025, "digital privacy and security defects" within the app allowed third parties to breach its walls and make off with thousands of fans' tickets. *Id.* ¶ 3. They did so by using "leaked or stolen credentials from other websites" to access users' accounts on the app. *Id.* ¶ 4. This type of breach, known as "credential stuffing," while common, is easy to prevent "with the most fundamental cybersecurity protections" such as two-factor authentication. *Id.* ¶¶ 3–4.

As part of this breach, plaintiffs had their tickets disappear from the MLBAM app. *Id.* ¶¶ 17–25, 29–31. Only Folkoff was able to recover his ticket before the event he paid to see started. *Id.* Logan had her tickets disappear, but unlike the other four plaintiffs, she paid a friend to purchase them, and they were stored on her friend's MLBAM account. *Id.* ¶¶ 26–28. Although MLBAM acknowledged the existence of the attack, it made no effort to improve the app's security and, until September 19, 2025, failed to publicly warn users about the breach. *Id.* ¶¶ 4, 48. To date, MLBAM

has not informed affected users what information may have been leaked when the bad actors compromised the app's security. *Id.* ¶ 5.

On November 26, 2025, plaintiffs filed the operative complaint. Dkt. 12. Each plaintiff claims to have suffered some combination of "actual loss of value for tickets purchased"; "loss of time"; "potential violations of their privacy, including the potential compromise of highly sensitive" information; "potential present, imminent and impending injury arising from the increased risk of identity theft and fraud"; and "additional potential loss of time." *Id.* ¶¶ 25, 95–96. Plaintiffs bring five causes of action against MLBAM: (1) violation of New York General Business Law ("NYGBL") § 349, (2) violation of NYGBL § 350, (3) negligence, (4) breach of implied contract, and (5) unjust enrichment. *Id.* ¶¶ 110–72. For these alleged violations, they seek both damages and equitable relief.

## LEGAL STANDARDS

To survive a motion to dismiss "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *United States ex rel. Chiles v. Cooke Inc.*, 185 F.4th 12, 18 (2d Cir. 2026) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim is plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Separately, "[i]n deciding motions to compel [arbitration], courts apply a 'standard similar to that applicable for a motion for summary judgment.'" *Silva v. Schmidt Baking Distribution, LLC*, 162 F.4th 354, 358 (2d Cir. 2025) (quoting *Edmundson v. Klarna, Inc.*, 85 F.4th 695, 702 (2d Cir. 2023)). As to this motion, the Court "considers all relevant, admissible evidence submitted by the parties" and "draws all reasonable inferences in favor of the non-moving party." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (cleaned up). To determine whether claims are subject to arbitration, "a court must consider (1) whether the parties have entered into a valid agreement to arbitrate, and, if so, (2) whether the dispute at issue comes within the scope of the arbitration agreement." *In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011).

## DISCUSSION

MLBAM brings four challenges to plaintiffs' action. First up in the rotation, MLBAM argues that plaintiffs lack standing to seek injunctive relief, and that two of the plaintiffs—Logan and Folkoff—lack standing as a general matter. Dkt. 18 at 6–12. Second, it says that plaintiffs' attempt to litigate their claims in court "is squarely foreclosed by the broad mandatory arbitration provisions" in the app's terms of use. Dkt. 19 at 1; *see* Dkt. 18 at 12–13. Third, it argues that even if plaintiffs could beat the tag on the standing and arbitration arguments, plaintiffs have failed to state any claim upon which relief can be granted. Dkt. 18 at 13–21. Finally, it presses that plaintiffs' "class claims" should be dismissed because plaintiffs waived any right to participate in a class action. *Id.* at 21–23.

While the Court rejects most of MLBAM's arguments, MLBAM is correct that Folkoff lacks standing and that plaintiffs have failed to allege a violation of either NYGBL § 349 or § 350. The plaintiffs, moreover, have abandoned their prayer for injunctive relief.

## I. Folkoff lacks standing, and plaintiffs have abandoned their prayer for injunctive relief

The Court first addresses jurisdiction. *See Calcano v. Swarovski N. Am. Ltd.*, 36 F.4th 68, 74 (2d Cir. 2022). "Under Article III, federal courts do not adjudicate hypothetical or abstract disputes." *In re Goebel*, 184 F.4th 59, 66 (2d Cir. 2026) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)). Instead, a party must have a "personal stake in the case"—that is, they must have standing. *Id.* (cleaned up). "To establish standing, a plaintiff must show (i) that [they] suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Id.* (cleaned up). "To survive a motion to dismiss for lack of standing, a plaintiff 'must allege facts that affirmatively and plausibly suggest that it has standing to sue.'" *Id.* at 67 (quoting *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011)).

The Court starts, as the parties do, with Logan. It is uncontested that Logan didn't purchase the disappearing tickets herself or store them on her own account. Rather, as mentioned above, she "paid her friend to purchase" the tickets, which were then stored on her friend's account. Dkt. 12 ¶¶ 26–28. According to MLBAM, Logan therefore "cannot claim an injury based on [its] alleged deceptive conduct and misleading statements," because those were, if anything, "directed at users of the [app]." Dkt. 18 at 7. In support, it highlights the doctrinal limitations on third-party standing. *Id.* (citing *Warth v. Seldin*, 422 U.S. 490 (1975)). But MLBAM is mistaken that Logan is effectively "stand[ing] in her friend's shoes to pursue [the] purported claims." *Id.* Her theory of standing is quite simple: She suffered a pecuniary harm when her tickets were stolen (an injury-in-fact); this theft was the result of MLBAM's faulty security (the injury is traceable to the defendant's actions); and she can be made whole by remuneration (the injury is redressable). *Cf. Warth*, 422 U.S. at 506–07 (holding that petitioners lacked standing because "the facts alleged fail[ed] to support an actionable causal relationship between [defendant's conduct] and petitioners' asserted injury"). It's not important for standing purposes that Logan didn't log in to an account she owned or purchase the tickets directly. Of course, such facts may be material to the merits of her claims given that they are, at least in part, premised on MLBAM's interaction with users' accounts. *See* Dkt. 12 ¶ 133 ("Defendant had a duty to Plaintiffs and each Class member to exercise reasonable care in holding, safeguarding and protecting *their accounts* . . . ." (emphasis added)). But MLBAM's argument doesn't implicate the Court's jurisdiction. *See SM Kids, LLC v. Google LLC*, 963 F.3d 206, 211–12 (2d Cir. 2020) (cautioning against "attempts to conflate the threshold question of the plaintiff's standing under Article III with the question of whether he has a valid claim on the merits" (cleaned up)).

Turning now to Folkoff, MLBAM argues that he only "suffered a significant loss of time" when his tickets disappeared (as he was able to recover them) and thus did not sustain a "concrete

injury-in-fact." Dkt. 18 at 8 (citing *TransUnion*, 594 U.S. at 424). Plaintiffs counter that loss of time is a concrete injury when personal data is exposed to third parties. *See Bohnak v. Marsh & McLennan Companies, Inc.*, 79 F.4th 276, 286 (2d Cir. 2023) (holding that "exposure of . . . private information . . . to an unauthorized malevolent actor" is a concrete injury). But unlike the cases they cite, plaintiffs do not affirmatively allege that any of Folkoff's personal data was exposed. *See FritzCo LLC v. Verizon Commc'ns Inc.*, 2026 WL 734776, at *4 (S.D.N.Y. Mar. 16, 2026) (highlighting allegations that plaintiff "provided Verizon personal identifying information" and "that this information was improperly accessed in a data breach"); *Pena v. Brit. Airways, PLC (UK)*, 849 F. App'x 13, 14 (2d Cir. 2021) ("[Plaintiff's] personal information was exposed as the result of a targeted attempt to obtain that information . . . ." (cleaned up)). Instead, the complaint states only that "Folkoff is unaware if his [personal identifiable information] and other information was . . . compromised as a result of the cybersecurity and privacy failures of" MLBAM's app. This is not a concrete injury; it is, by its own terms, speculative. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016) ("A 'concrete' injury must be 'de facto'; that is, it must actually exist."); *Bycko v. State Farm Mut. Auto. Ins. Co.*, 2023 WL 7411752, at *6 (D.N.J. Nov. 9, 2023) (holding that plaintiffs lacked standing when they did not "allege that their information was in fact disclosed"). Folkoff's allegation regarding his "loss of time," without more, is insufficient by itself to confer standing. *See Grinblat v. Frontline Asset Strategies, LLC*, 2023 WL 5002474, at * 3 (S.D.N.Y. Aug. 4, 2023) ("[T]he expenditure of time alone is insufficient to establish standing . . . ."). Folkoff has thus failed to show that he has standing to proceed with this suit.

MLBAM next argues that all plaintiffs lack standing to seek injunctive relief "to ensure the protection of [their] sensitive information." Dkt. 12 at 48; *see Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000) ("[A] plaintiff must demonstrate standing separately for each form of relief sought."). Because plaintiffs fail to address this contention in their opposition brief, they have abandoned their prayer for injunctive relief. *See Malik v. City of New York*, 841 F. App'x 281, 284 (2d Cir. 2021) ("When a party fails adequately to present arguments in a brief, a court may properly consider those arguments abandoned, especially in the case of a counseled party where a court may infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned." (cleaned up)); *Schik v. Miramed Revenue Grp., LLC*, 2020 WL 5659553, at *7 (S.D.N.Y. Sept. 23, 2020) (collecting cases).

## II. MLBAM has failed to show that plaintiffs agreed to arbitrate their claims

Having confirmed that there is jurisdiction—except over Folkoff's claims—the Court now turns to MLBAM's argument that plaintiffs are required to arbitrate. Dkt. 19. As for the plaintiffs other than Logan, they plainly aren't. As to Logan, further discovery is needed to determine whether her claims are subject to arbitration.

### A. Background

On February 6, 2024, MLBAM issued a "Term of Use Agreement" (the "2024 TOU") to govern activity on its app. Dkt. 19-2 ¶¶ 2, 11, 13. The 2024 TOU contains an arbitration provision that states:

> **Binding Arbitration.** Any dispute or claim arising out of or relating to this Agreement, or your use of any MLB Digital Property (including all commercial transactions conducted through the MLB Digital Properties), whether based in contract, tort, statute, fraud, misrepresentation, common law, or any other legal theory, ("Dispute") will be resolved through binding individual arbitration, *except for claims identified as Non-Arbitrable Claims* below.

Dkt. 19-3 at 8 (emphasis added). Included within those "Non-Arbitrable Claims" is the following:

> [A]ny dispute or claim *related to the alleged violation of your privacy rights or interests* whether based in contract, tort, statute, fraud, misrepresentation, common law, rule, regulation, *or any other legal theory*, including but not limited to: (i) claims under the Video Privacy Protection Act and corresponding state video privacy laws; (ii) claims under the Federal Wiretap Act and other federal and state wiretapping laws; or (iii) *any other alleged violation of your privacy rights or interests* that is based on the use of technology, including, but not limited to, any code, software, software development kit, and/or application programming interface, on any MLB Digital Property or use of that technology to allegedly intercept, record, collect, possess, procure, or disclose any information, including but not limited to personally identifiable information and video viewing behavior (without concession that any such claims, including those under video privacy or wiretapping laws, apply to any MLB Entity).

*Id.* at 8–9 (emphases added).

According to MLBAM, when it published the 2024 TOU, it sent an email out to all "addresses associated with an" MLBAM account. Dkt. 19-2 ¶ 19. That email noted that the terms of use had been amended to update "dispute resolution policies, including . . . arbitration procedures" and that "[b]y continuing to use our services (including our websites and mobile applications) on or after February 6, 2024, you agree to our updated Privacy Policy and Terms of Use Agreement." *Id.* Moreover, a visual pop-up was displayed on the app between February 8, 2024, and March 25, 2024, that read: "The MLB Privacy Policy and Terms of Use Agreement have been updated . . . to update the arbitration and dispute resolution procedures . . . . By continuing to use our services, you agree to the updated Privacy Policy and Terms of Use Agreement." *Id.* ¶ 20. In both forms of notice, the words "Terms of Use Agreement" were blue, bolded, and hyperlinked. *Id.* The 2024 TOU was updated slightly in March 2025, but the language related to arbitration remained the same. *Id.* ¶ 11.

There are various ways a user might agree to the 2024 TOU. First, during the 2025 MLB season, whenever a user created an account within the app, the sign-up screen stated, just below the "Register" button: "By signing up, I understand and agree to be bound by the MLB.com Terms of Use and Privacy Policy." Dkt. 19-2 ¶¶ 26–27; *see id.* ¶¶ 24–25 (showing a similar screen when users register on MLB.com). Additionally, whenever a user logged into the MLBAM app during

that season, they were routed to a sign in page, which stated "[b]y logging in, I understand and agree to be bound by the MLB.com Terms of Use and Privacy Policy." Dkt. 19-2 ¶ 28.

All the plaintiffs, other than Logan, created an account with MLBAM prior to August 2020. *Id.* ¶¶ 32, 34, 36, 38, 39. MLBAM also introduced an uncontested declaration stating that Lanham and Harnish must have been "logged in" to their accounts during the 2025 MLBAM season to scan their tickets. *Id.* ¶¶ 32–37. And while this declaration doesn't state that Oswald scanned a ticket during that season, it declares that, like Lanham and Harnish, she "accessed her [MLBAM app] numerous times between 2019 and 2025." *Id.* ¶ 38.

**B. MLBAM has failed to show that the claims are subject to arbitration**

Even if MLBAM could demonstrate that plaintiffs agreed to the 2024 TOU, which is unclear based on the current record, all the plaintiffs' claims except for Logan's fall within the arbitration agreement's broad carveout provision.

After specifying the claims subject to arbitration, the 2024 TOU exempts from that requirement "any dispute or claim related to the alleged violation of . . . privacy rights or interests whether based in contract, tort, statute, fraud, misrepresentation, common law, rule, regulation, or any other legal theory." Dkt. 19-3 at 8–9. It further provides non-exclusive examples of such a dispute, including "*any* other alleged violation of your privacy rights or interests that is based on the use of technology." *Id.* (emphasis added).

At the heart of this case is the allegation that "digital privacy and security defects" within the MLBAM app allowed third parties to compromise its systems, invade plaintiffs' accounts, and make off with their tickets and, potentially, private information. Dkt. 12 ¶¶ 3, 38; *see Davitashvili v. Grubhub Inc.*, 131 F.4th 109, 119 (2d Cir. 2025) (focusing on the "factual allegations in the complaint rather than the legal causes of action asserted" (quoting *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 36 (2d Cir. 2002))). The claims at issue thus clearly "relate[] to" the violation of their privacy interests, *see* C*hevron USA Inc. v. Plaquemines Par., Louisiana*, 608 U.S. 1, 11 (2026) (noting the breadth of the term "relating to"), specifically, plaintiffs' interests in the security of their accounts and personal property. MLBAM offers three arguments in rebuttal, but none are persuasive.

First, it highlights that plaintiffs claim to have suffered only "*potential* violations of their privacy" and thus do not fall within the carveout's scope. Dkt. 19 at 17. But the plaintiffs alleged that bad actors infiltrated their accounts and exfiltrated their tickets. Dkt. 12 ¶ 54. They undoubtedly have a privacy interest in the security of their accounts and their accounts' contents. Imagine if a robber were to break into a person's house because their security system was faulty. While inside, they had ready access to all the homeowner's personal information and effects, and they stole their most prized possession: season baseball tickets. It would be absurd to say that the victim didn't suffer a violation of their privacy just because the thief didn't also walk away with their passport and wallet. Here, plaintiffs allege that MLBAM promised that they would keep their accounts secure. Dkt. 12 ¶ 3. Due to allegedly inadequate systems, however, MLBAM failed to fulfill that promise, and cybercriminals were able to access and rummage through plaintiffs' accounts and

take off with their personal possessions. *Id.* That fits within the capacious carveout contained in the 2024 TOU. *Cf. Pure Power Boot Camp v. Warrior Fitness Boot Camp*, 587 F. Supp. 2d 548, 568–69 (S.D.N.Y. 2008) (noting that "accessing" a person's email accounts "offend[s] general notions of personal privacy"). That is true even if plaintiffs' claims also implicate non-privacy rights. Recall the broad wording of the 2024 TOU's carve-out, which preserves for litigation not only privacy-based claims, but "any dispute or claim" that is "related" to an alleged violation of a user's "privacy . . . interests" based on "any . . . legal theory." Dkt. 19-3 at 8–9.

Second, MLBAM presses that the only pieces of information that could have been exposed are the plaintiffs' "names, email addresses, phone numbers, [physical] addresses, and birthdates." Dkt. 19-2 ¶ 40. Because all this is "basic publicly available information," MLBAM contends that the hacking incident would not "give rise to an imminent risk of identity theft or fraud." Dkt. 19 at 17–18. First off, this argument ignores the crux of the question, which is whether plaintiffs' claims "relate to" a violation of their "privacy rights or interests," not whether it would give rise to "identity theft." Dkt. 19-3 at 8. And separately, despite MLBAM's assertion that such information is "publicly available," the Second Circuit has said in an analogous context that there is "no doubt that individual[s] . . . have a significant privacy interest in avoiding disclosure of their names and addresses." *Hopkins v. U.S. Dep't of Hous. & Urb. Dev.*, 929 F.2d 81, 87 (2d Cir. 1991). Exposure of this type of information clearly implicates plaintiffs' privacy interests.

Finally, MLBAM contends that the carveout in the 2024 TOU only applies to incidents where MLBAM is the entity responsible for "invad[ing] [p]laintiffs' privacy." Dkt. 19 at 18. In support it points to the "illustrative categories of claims" in the carveout: "(i) wiretapping claims, (ii) claims under video privacy laws, and (iii) claims based on the use of technology on MLB's web properties to 'intercept, record, collect, possess, procure, or disclose' information." *Id.* (citing Dkt. 19-3 at 8–9). But the carveout is explicitly "not limited to" these examples. Dkt. 19-3 at 8–9. Indeed, it applies to "*any* dispute or claim *related to*" alleged privacy violations "whether based in contract, tort, statute, . . . or *any other legal theory*." *Id.* (emphasis added). The plain language goes well beyond the examples that MLBAM draws a box around.

This leaves Logan. Unlike the other plaintiffs, she can't rely on the carveout in the 2024 TOU. She didn't have an account on the app, and there are no allegations that her personal information was even potentially taken. Dkt. 12 ¶¶ 26–28. To go back to the robber analogy, if Logan left her prized Aaron Judge rookie card at her friend's house and it was stolen, she might have a claim against the robber, but it wouldn't implicate her privacy interests.

So the question of whether Logan's claims are subject to arbitration turns on whether she, or someone else acting on her behalf, agreed to arbitrate her claims against MLBAM. At this stage, the evidentiary record isn't clear enough to make that determination. Because the complaint doesn't say whose account Logan's tickets were on, MLBAM can't say for certain whether that user saw and agreed to the 2024 TOU. Discovery is needed to clear up these issues, and MLBAM may file a renewed motion to compel arbitration of Logan's claims. Any such motion should address some of the evidentiary gaps that exist in the present record: whether (1) Logan's friend accessed tickets through the site during the time when users were required to agree to the

2024 TOU, (2) users had to log in when accessing tickets at that time, (3) accessing tickets required users to log in to their account *each time* or if they could access them as part of a previous session's login, and (4) logging in required users to agree to the 2024 TOU.

## III. MLBAM's motion to dismiss is granted in part, denied in part

As an alternative to its motion to compel arbitration, MLBAM argues that the complaint should be dismissed for failure to state a claim. Dkt. 18 at 13–23. It presents its arguments on a claim-by-claim basis, so the Court follows its lead.

Plaintiffs have failed to state a claim under either NYGBL § 349 or § 350. They also concede that their unjust enrichment claim should be dismissed. Dkt. 29-1 at 3. Plaintiffs have, however, stated a claim for negligence and breach of implied contract. The Court declines to strike the class allegations at this juncture, but MLBAM can reprise its arguments in response to plaintiffs' class certification motion or in support of summary judgment.

### A. Plaintiffs have failed to state a claim under NYGBL § 349 or § 350

To succeed on a claim under either NYGBL § 349 or § 350, plaintiffs must prove three elements: (1) "that the challenged act or practice was consumer-oriented"; (2) "that [the act or practice] was misleading in a material way"; and (3) "that the plaintiff[s] suffered injury as a result of the deceptive act" or practice. *Stutman v. Chem. Bank*, 731 N.E.2d 608, 611 (N.Y. 2000). Additionally, the alleged consumer deception "must occur in New York." *Goshen v. Mut. Life Ins. Co. of N.Y.*, 774 N.E.2d 1190, 1195 (N.Y. 2002). MLBAM contends that plaintiffs cannot make these showings, because they fail to plausibly allege (a) "when, how, or where they were exposed to any purportedly deceptive statements by MLBAM" and (b) "that any such conduct occurred in New York." Dkt. 18 at 13. Because the Court agrees that plaintiffs have failed to establish that the relevant conduct occurred in New York, it declines to opine on the former contention.

In *Goshen*, the New York Court of Appeals set out to determine "whether an allegedly deceptive scheme that originates in New York, but injures a consumer in a transaction outside the state, constitutes an actionable deceptive act or practice" under Sections 349 and 350. 774 N.E.2d at 1193; *see Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 122 (2d Cir. 2013) (noting that *Goshen*'s territorial limitation applies to both Section 349 and Section 350). It answered that question in the negative. *Goshen*, 774 N.E.2d at 1193. There, the plaintiffs (in one of the consolidated cases) were internet subscribers, whose service was provided by various Delaware corporations headquartered in New York and Virginia. *Id.* at 1194. The plaintiffs included both New York and non-New York residents. *Id.* The court held that the New York residents had a claim. *Id.* at 1196–97. But pointing to the requirement that "deception of a consumer must occur in New York," it reached the opposite conclusion with respect to the non-New Yorkers. *Id.* at 1195. These plaintiffs, the court held, failed to "allege that they were deceived in New York" and thus to "state any cognizable cause of action." *Id.* at 1196. The Second Circuit has since read *Goshen* as requiring "the transaction in which the consumer is deceived" to have occurred in New York. *Cruz*, 720 F.3d at 123.

Here, plaintiffs allege that purportedly "deceptive terms . . . were published on a website" by a company with a principal place of business in New York. *Kaufman v. Sirius XM Radio, Inc.*, 474 F. App'x 5, 7–8 (2d Cir. 2012); Dkt. 12 ¶¶ 32, 110–128. None of the plaintiffs are residents of New York, Dkt. 12 ¶¶ 17, 20, 23, 26, 29 (alleging that plaintiffs are residents of Illinois, Indiana, and Iowa), they do not claim to have engaged in any transactions or viewed any deceptive content while they were within the state, and none of the pleadings otherwise tie the pertinent transactions to New York. Without more, plaintiffs cannot meet *Goshen*'s transaction requirement. *See Wheeler v. Topps Co., Inc.*, 652 F. Supp. 3d 426, 431 (S.D.N.Y. 2023) ("Courts have consistently rejected claims under § 349 and § 350 based solely on an out-of-state customer's interacting with a website controlled in New York."). Plaintiffs' cited authorities don't say otherwise. In *Ward v. TheLadders.com, Inc.*, while the defendant did "operate[] a website in New York," it also "maintained its bank account in New York" and "[m]any of the relevant communications and transactions with the defendant, including the registration, cancellation, review of website materials, and various monetary transactions, apparently occurred on or through the website itself, which is equivalent to communicating or transacting directly with a New York address." 3 F. Supp. 3d 151, 168 (S.D.N.Y. 2014); *see also Cruz*, 720 F.3d at 123–24 ("FXDD is paid in New York and refuses to disburse funds from customer accounts until it receives a 'Funds Redemption Form' at its New York office. FXDD requires that all customer communications, including the Agreement and objections to trades, be sent to its New York office."). And in *Gutierrez v. Lemonade, Inc.*, the court focused on the plaintiffs' allegations concerning the choice-of-law clause found in defendant's terms of use. *See* 2022 WL 3214852, at *3 (S.D.N.Y. Aug. 9, 2022). But here, plaintiffs disclaim any reliance on the terms of use, or even that they agreed to them.

Plaintiffs have therefore failed to state a claim under either NYGBL § 349 or § 350.

### B. Plaintiffs have stated a claim for negligence

MLBAM next takes aim at plaintiffs' negligence claim. Dkt. 18 at 16. It contends that plaintiffs failed to plead damages. *See Ferreira v. City of Binghamton*, 975 F.3d 255 (2d Cir. 2020) ("To show negligence under New York state law, a plaintiff must demonstrate" that they "suffered damage as a proximate result" of defendant's actions). The Court disagrees.

MLBAM appears to focus solely on the fact that some of the plaintiffs were reimbursed. Dkt. 18 at 17–18. But it's not clear from the face of the complaint whether plaintiffs (other than Folkoff) were reimbursed for both their original tickets *and* replacement tickets. *See, e.g.*, Dkt. 12 ¶ 18 ("Lanham's tickets disappeared from his MLB Ballpark App[,] which resulted in him having to forgo the first hour of the game, purchase additional tickets for the same game, and spend hours after the game seeking a refund of the purchase price."). If they were reimbursed for only one or the other, plaintiffs would have evidently suffered damages given that they all missed a significant portion of the events they paid to see. *See id.* ¶¶ 18, 24, 27, 30. In any event, plaintiffs' allegations that they had to forgo portions of the events for which they purchased tickets, *id.*, and suffered an "actual loss of value for tickets purchased," *id.* ¶ 96, is enough to support a claim for damages at this stage of the litigation. *Cf. De Medicis v. Ally Bank*, 2024 WL 1257022, at *6 (S.D.N.Y. Mar.

25, 2024) (holding that plaintiff had not "suffered actual harm" where he conceded that "he was fully reimbursed").

To be sure, the facts elicited in discovery may show that plaintiffs suffered no cognizable harm due to MLBAM's conduct. But at this stage, MLBAM's argument that plaintiffs failed to plausibly allege damages is rejected.

### C. Plaintiffs have stated a claim for breach of implied contract

Plaintiffs next allege that MLBAM breached an implied contract, consisting of the exchange of "money and/or valuable [personal identifying information]" for MLBAM safeguarding the tickets plaintiffs purchased. MLBAM doesn't point to 2024 TOU as an explicit contract that would foreclose such a claim. Instead, MLBAM solely argues that plaintiffs' implied contract claim fails because the complaint "lacks allegations sufficient to plead consideration." Dkt. 18 at 19; *see Maas v. Cornell Univ.*, 721 N.E.2d 966, 970 (N.Y. 1999) (An "implied-in-fact" contract requires "consideration"); *Est. of Airday v. City of New York*, 2023 WL 4571967, at *2 (2d Cir. July 18, 2023) ("Under New York law, an implied contract requires consideration . . . ."). But as MLBAM itself notes, the complaint alleges that plaintiffs "turned over money and/or valuable PII in exchange for" the ability "to purchase, transfer, and otherwise use digital baseball tickets through the application." Dkt. 12 ¶¶ 40, 153; *see id.* ¶¶ 38, 131, 155.

These allegations are sufficient to defeat MLBAM's no-consideration argument. *See Wallace v. Health Quest Sys., Inc.*, 2021 WL 1109727, at *10–11 (S.D.N.Y. Mar. 23, 2021) (finding "inference of an implied contract for the exercise of reasonable care in protecting plaintiffs' private information in exchange for plaintiffs' provision of business"); *FritzCo LLC v. Verizon Commc'ns Inc.*, 2026 WL 734776, at *7 (S.D.N.Y. Mar. 16, 2026) ("These facts establish that Verizon obtained and maintained confidential customer information as part of providing services to Verizon Business customers, evincing an implicit promise by defendants to protect their customers' information from unauthorized users." (cleaned up)).

### D. The Court declines to address MLBAM's class-waiver argument at this juncture

Finally, MLBAM contends that the Court should "dismiss the class claims with prejudice and order [p]laintiffs to proceed on an individual basis because [p]laintiffs waived any right to bring or participate in a class action." Dkt. 18 at 21. MLBAM's argument is based on the class-action waiver contained in the 2024 TOU. However, plaintiffs' complaint does not rely, explicitly or implicitly, on those terms of use. For that reason, it would be improper to rely on the 2024 TOU to dismiss plaintiffs' class allegations at this juncture. Moreover, as the Court indicated above as to Logan, the record isn't clear whether or when plaintiffs agreed to the 2024 TOU. For these reasons, the Court declines to address the class-action waiver argument at this juncture. *See, e.g.*, *Berger v. JetBlue Airways Corp.*, 2024 WL 4107243, at *3 (E.D.N.Y. Sept. 6, 2024) ("[A] district court may defer consideration of the effect of a class action waiver until after discovery if its applicability is not obvious from the face of a complaint."); *Burns v. SeaWorld Parks & Ent., Inc.*, 675 F. Supp. 3d 532, 550–51 (E.D. Pa. 2023) (declining to consider a class-action waiver because

"terms and conditions extrinsic to the tickets and passes referenced in the Amended Complaint cannot properly be considered in deciding" a motion to dismiss). However, MLBAM can reraise this argument in opposition to class certification or in support of summary judgment. *Archer v. Carnival Corp. & PLC*, 2020 WL 9264981, at *3 (C.D. Cal. Sept. 22, 2020) ("The [c]ourt is best equipped to rule on the enforceability of [a class-action waiver] in the context of [a] motion for class certification, rather than the present Motion to Dismiss.").

**CONCLUSION**

For these reasons, MLBAM's motion to compel arbitration is DENIED, and its motion to dismiss is GRANTED IN PART and DENIED IN PART.

The Clerk of Court is respectfully directed to terminate the motions at Dkts. 18 and 19.

SO ORDERED.

Dated: September 30, 2026
New York, New York

ARUN SUBRAMANIAN
United States District Judge